MARTÍNEZ v. DELGADO ET AL.

APPEAL from the District Court of Ponce.

No. 653.—Decided originally June 17, 1911.

Decided on reconsideration May 10, 1912.

POWER OF COURTS TO AMEND JUDGMENT.—In accordance with section 7, paragraph 8, of the Code of Civil Procedure, every court has power to amend and control its processes and orders so as to make them conformable to law and justice.

ID.—TIME WITHIN WHICH POWER SHOULD BE EXERCISED.—It is a well-established general rule that a judgment cannot be amended on an *ex parte* motion after the expiration of the term of the court in which it was rendered. Due and proper notice of the motion and of-the amendment desired must be given to the adverse party so that said party may have an opportunity to appear and oppose the amendment sought.

ID.—NULLITY OF AMENDMENT.—If the amendment is made after the close of the term of the court during which the judgment was rendered without notice to the adverse party it is null and void for lack of jurisdiction.

ID.—AMENDMENT OF JUDGMENT AFTER APPEAL.—After a judgment has been appealed from the trial court it has no jurisdiction to amend it unless the appellant abandon the appeal or perform some act inconsistent with its prosecution.

ON RECONSIDERATION.

JURISDICTION—MODIFICATION OF JUDGMENT BY TRIAL COURT AFTER APPEAL.—When a judgment has been appealed from, the trial court generally loses its jurisdiction to modify it without previous notice to and consent of the appellee.

JUDGMENT—APPEAL—MODIFICATION OF JUDGMENT BY TRIAL COURT AFTER APPEAL.—When a judgment which has been appealed from is modified in certain immaterial points by the trial court after notice to and consent of the appellee the original judgment is not substituted or annulled by the amended judgment and the date of the original judgment is that which governs, the subsequent amended judgment being considered as an order *nunc pro tunc* or as relating back to the original judgment and the appeal taken and pending is not prejudiced by said modification.

ACTION OF EJECTMENT—IDENTIFICATION OF PROPERTY—CHANGE OF BOUNDARIES.—The mere fact that the boundaries of a property have been stated erroneously in a deed does not affect the location of the property which has been described by mentioning the lands of one of the former owners as bounding it on the east when it is known that they lie on the west and by stating that it is bounded on the west by lands which are known to lie on the east, nor if when the boundaries begin at the point claimed by the defendant, not the land in litigation but that of an adjoining owner would lie within them; and it should be taken into account above all that the lands in litigation were segregated from an estate of 760 *cuerdas* and that the lands alleged to lie between the two properties in litigation formed part of another estate of 400 *cuerdas,* which two original estates formerly bounded each other.

The facts are stated in the opinion.

*Mr. Jesús M. Rossy, Fiscal,* for appellant.

*Mr. José Tous Soto* for respondent.

MR. JUSTICE DEL TORO delivered the opinion of the court.

Complaint was filed in this case by Dionisia Martínez against Juan Delgado and The People of Porto Rico. The trial was held and on April 30, 1910, judgment was rendered against the defendants. On May 17, 1910, an appeal from said judgment was taken to this Supreme Court by defendant, The People of Porto Rico.

Upon motion of the plaintiff, the judgment of April 30 was amended by the trial court while the appeal was pending, by supplementing the following pronouncement: "and it is ordered that delivery be made to the plaintiff of the products received by the receiver, or the proceeds thereof in money, after deducting the expenses of administration."

The amended judgment was rendered and entered as a new judgment on July 18, 1910, and it does not appear that appeal was taken therefrom.

The appellant alleges that in amending the judgment the district court acted without jurisdiction, and, on the other hand, the respondent maintains that the judgment of July 18 is valid, and that no appeal having been taken therefrom it should be considered as final, and that the appeal taken from the judgment of April 30 should be dismissed.

Section 7, paragraph 8, of the Code of Civil Procedure, provides that every court has power to amend and control its processes and orders so as to make them conformable to law and justice.

"The authorities all hold that a court has plenary control of its judgments, orders, and decrees during the term at which they are rendered, and may amend, correct, modify, or supplement them, for cause appearing, or may, to promote justice, revise, supersede, revoke, or vacate them, as may in its discretion seem necessary." 1 Black on Judgments, 219.

It is clear that in the present case the district court did not supplement its judgment during the term at which it was rendered. The terms of the district courts of this Island being five, each lasting two months, it is concluded that the

judgment could not have been rendered and amended during the same term.

"That part of the common law rule which declares that no judgment can be amended after the term at which it was rendered can scarcely be said to survive in this country in all its original inflexibility." 1 Black on Judgments, 220.

"A judgment once entered must be corrected, if irregular or erroneous, by some proper proceeding for that purpose; it cannot be merely disregarded and the proper judgment entered anew. During the term at which the judgment was rendered, the correction may be made by an order of the court upon a mere suggestion of the error. But after the term is ended, according to the practice in many of the States, the amendments can only be made upon the presentation of a formal petition and motion, setting forth the mistake and the alteration prayed for, and after proper notice to the adverse party to appear and show reasons why the correction should not be made * * *. The general rule is well established that a judgment cannot be amended, after the term at which it was rendered, upon an *ex parte* application. Due and proper notice must be given to the opposite party of the application and the relief asked, that he may have an opportunity to appear and show cause against the proposed correction." 1 Black on Judgments, 239, 240.

Upon examination of the record in this case it does not appear that the opposite party or appellants intervened in the amendment proceedings held after the term at which judgment was rendered, and by reason thereof it must be concluded that the jurisdiction of the district court does not appear clear. From the fact that the appellants included the amended judgment in the transcript it is deduced that they had knowledge of the existence thereof, but not that they accepted such amended judgment as valid.

Moreover, the amendment appears to have been made after appeal was taken—that is, when in accordance with the law and jurisprudence the district court could have no jurisdiction unless the appellants abandoned their appeal or did some act inconsistent with the prosecution thereof, and this does not appear from the record. See 3 Cyc., 201.

As a result of the foregoing we shall consider, therefore, that the only judgment rendered validly in this case is that of April 30, 1910, from which the present appeal was taken, the amended judgment of July 18, 1910, being void because the district court had no jurisdiction in the case when the same was rendered. *Smith* v. *Haynes,* 30 Tex., 502.

The preceding main question being decided we shall consider the appeal and decide the same on its merits.

The plaintiff, Dionisia Martínez, alleged in her sworn complaint:

"First. That she is the owner of the following estate:

"Parcel of land situated in *barrio* San Patricio, formerly Guaraguaos, municipality of Ponce, composed of 84 *cuerdas,* although 76 *cuerdas* only appear in the registry; bounded on the east by lands of the Succession Joglar; on the south by the San Patricio River; on the west by a creek and an estate composed of 180 *cuerdas* belonging to Juan Principe, of which The People of Porto Rico acquired 90 *cuerdas* and afterward 60 more in lieu of taxes; and on the north by the mountain range dividing the districts of Utuado and Ponce. Said property is recorded in the registry of property on folio 195 of volume 143, Ponce, estate No. 174, duplicate, 7th entry, and is marked letter (B) in the accompanying plan.

"Second. That The People of Porto Rico leased to Juan Delgado of the aforesaid 60 and 90 *cuerdas,* through a surveyor of the Department of the Interior, acting on suggestion of Juan Delgado, of the lands described in the first paragraph, which were not sold at auction nor are in arrears of taxes, which lands said Juan Delgado occupied formerly without title and at present occupies." (*Sic.*)

The sworn answer of the defendant, Juan Delgado:

"First. Specifically denies that the plaintiff is the owner of the property described in the first paragraph of the complaint and states:

"Second. That although he admits having entered and taken possession of the land he did so as the lessee of The People of Porto Rico, his lease bearing date March 19, 1906. The other statements contained in the second paragraph are denied."

The other defendant, The People of Porto Rico, also filed a sworn answer, as follows:

"First. We deny the facts stated in paragraph 1 of the complaint.

"Second. We also deny the facts stated in paragraph 2 of the complaint."

Both parties appeared at the trial and introduced their evidence. The court rendered judgment sustaining the complaint, and decreed that the lands described belonged to the plaintiff, Dionisia Martínez. It further decreed the ejectment of the defendants therefrom, and that the latter should vacate the premises and leave them at the free disposal of the plaintiff.

The evidence shows that Juan Príncipe Vázquez appeared in the registry, and also for purposes of taxation, as the owner of two landed estates in the municipal district of Ponce, one of such estates being composed of 180 *cuerdas* and the other of 76.

Príncipe having failed to pay the taxes levied on the estate of 180 *cuerdas*, a part thereof was attached and sold at auction in the office of the collector of internal revenue of Ponce, on March 9, 1904, the same being acquired by The People of Porto Rico in lieu of the sum of $344.88 due for taxes. Juan Príncipe did not redeem the said lands, and dominion thereof was recorded in the registry in favor of The People of Porto Rico on July 2, 1904. On March 19, 1906, The People of Porto Rico leased the aforesaid lands to Juan Delgado.

Under such circumstances complaint was filed by the plaintiff, Dionisia Martínez, and the issue in the present case is whether the lands acquired by The People and leased to Delgado, which are at present held by The People as owner and by Delgado as lessee, are in fact a part of the estate of 180 *cuerdas* which belonged to Príncipe or the estate of 76 *cuerdas* sold by Príncipe to the plaintiff, Dionisia Martínez.

A careful examination of the evidence creates a doubt in our mind as to whether or not the plaintiff identified as her property the lands claimed by her, this being an essential requisite before her action of ejectment can prosper.

Upon examination of the entries in the registry of property relative to the estate of 76 *cuerdas*, it is noted that the eastern boundary thereof was varied when the same was sold by the marshal of the Municipal Court of Ponce in proceedings brought against Juan Príncipe to recover a debt; that such variation was apparently due to data furnished by said Príncipe; that Príncipe acquired the lands anew with the boundary changed, and that he sold the same in such form to the plaintiff.

Such change was indispensable so that the estate of 76 *cuerdas* should be contiguous to that of 180 *cuerdas*, and so that it could be alleged that the former is the same actually held by the defendants.

If it is also considered as several witnesses affirm that the old estate of Eusebio Martínez, sold by his succession to Príncipe and acquired finally by the plaintiff, is in another part of the same *barrio*, and that if the estate possessed by the defendants is that of the 76 *cuerdas* it is then impossible to find the total of the other estate of 180 *cuerdas*, we must conclude that the evidence relative to the identity is very doubtful, as above stated, and that for such reason the appeal could be allowed and the complaint dismissed.

Now, then, upon examination of the evidence some circumstances favorable to the plaintiff are found. Among these is that according to the title of the estate of 180 *cuerdas* this is adjacent on the west to lands of Eusebio Martínez, the former owner of the estate of 76.

Such being the case, we are of the opinion that the ends of justice are better served by applying to this case the rule laid down by this Supreme Court in the following cases:

*Dapena* v. *Succession of Dominici,* 12 P. R. R., 61; *Cepeda* v. *Andino,* 12 P. R. R., 190, and by sustaining the appeal in view thereof although granting a new trial in which the parties, with the experience acquired in the first, may introduce complete and decisive evidence permitting the decision of the case without doubt or hesitation.

                  · *Decided accordingly.*

Chief Justice Hernández and Justices Wolf and Aldrey concurred.

Mr. Justice MacLeary did not take part in the decision of this case.

---

A petition for reconsideration was subsequently filed, in response to which Mr. Justice Wolf, on May 10, 1912, delivered the following opinion of the court:

Counsel for appellee draws our attention to the fact that the judgment in this case of April 30, 1910, was amended or modified by the order or judgment of July 18 after due notice had been given to the other side, and he brings us a certificate to that effect. He also cites us authorities which hold that it would always be presumed that the act of the court was taken after due notice. The basis of our previous judgment and opinion in regard to the relation between these two decisions was that the district court, by reason of the appeal from the judgment of April 30, had lost jurisdiction. Without due notice to the respondent of a proposed change in the judgment and the acquiescence of the respondent the jurisdiction of the trial court would generally be lost after appeal, and the appellant would have a right to insist upon the disposition of such appeal by the appellate court. In the present appeal, however, our jurisdiction to review the judgment of April 30 is evidenced by other considerations.

The judgment of April 30 was duly appealed and we permitted a copy of the judgment to be certified to us after the transfer of the cause. The appeal itself gave us jurisdiction. After due notice this judgment of the district court was modified by a decision of July 18, 1910, and recited that in view of·the motion of the respondent asking for an amendment of the judgment rendered on April 30, 1910, such judgment should be amended to read as followed. Then followed the complete judgment wherein the only modification was a recital of the disposition of certain rentals in the hands of the receiver who had been appointed in the case. The principal decision, namely, the awarding of the proprietorship to the complainant and respondent, remained unaffected. The decision of July 18, 1910, although in form a judgment and recorded as such, did not supersede the judgment of April 30. The latter had been and remained a judgment from the date of its rendition. It had been executionable since April and it had changed or fixed the title of the respondent from that date. Prescription would have begun to run against her from then as that was the time when her rights were determined. The subsequent decision must either be considered as an order *nunc pro tunc* or as relating back to the judgment of April 30. This view is supported by the case of *Estate of Potter*, 141 Cal., 425, cited by respondent. While it is true that the parties consented to a change or modification, the pending appeal was unaffected. This consideration becomes more evident from the certificate at the end of the transcript which is as follows:

"We, Rafael Palacios Rodríguez, *fiscal* of the district, in representation of the defendant People of Porto Rico and appellant, and José Tous Soto, attorney of the complainant and respondent, by the present agree and certify that the foregoing is a faithful transcript containing the correct and exact copies necessary for this appeal of the originals in possession of the secretary of the district court on file in the present case, and that the transcribed matter forms the record (*antecedentes*), documents, proofs, and other proceedings.

taken in consideration by the District Court of Ponce to render the appealed judgment, signing this transcript in order that it may form the record of this appeal and be used as such in the hearing of the same. Ponce, Porto Rico, December 24, 1910.'' (Signed by the two lawyers.)

The record and papers are described as correct and the intention is manifest to proceed with the pending appeal of which we had never lost jurisdiction by the act of the parties in consenting to the amendment.

On the rehearing of this case the attorney for the respondent informed us that in her first brief the respondent had not made a thorough analysis because she relied mainly on the rule established by this court that where the proof is contradictory this court will not reverse in the absence of prejudice, partiality, passion, or like element. Respondent now not only points out to us an existing conflict but makes a more complete analysis of the documentary proof as presented. The doubt that arose in our minds was because of the apparently unexplained and radical variation in the boundaries of the property sought to be recovered, and because a number of witnesses placed the farm No. 174, claimed by respondent, in a totally different locality. We then thought that these matters could be better cleared up at another trial, but a more extended consideration and examination has convinced us of the correctness of respondent's position.

The description of the property claimed by the respondent in her complaint is as follows:

"A piece of land in the ward of San Patricio, formerly 'Guaraguaos,' in the municipal district of Ponce, composed of 84 acres, although only 76 are mentioned in the registry, bounded on the east by the Succession Joglar; on the south by the San Patricio River; on the west by a brook and by a farm of 180 acres, the property of Juan Príncipe, of which said farm The People of Porto Rico sold at public auction first 90 acres and then 60 more in payment of taxes; and on the north by the ridge that divides the municipal districts of Ponce and Utuado.''

This is property No. 174 and the description contained in the complaint is the latest description in the registry of property. It is also the description contained in the conveyances immediately preceding the conveyance to respondent. However, when property No. 174 was first segregated out of a parcel of larger area its description was as follows:

"A piece of land situated in the limits of this city, ward of Guaraguaos, locality of San Patricio, with the following points and boundaries: Beginning at a stone with a hole (*piedra agujerala*) which is on the bank of the river following the side and boundary of José Ayala in a straight line up to the heights of Yauco, where there is a laurel tree, which forms a point and corner of the Ayala; going up the ridge until arriving at a plane in said ridge where there is another tree, of guava, forming a point with Juan Salcedo; from there continuing toward the west in a straight line until arriving at a hillock of the ridge; from there proceeding to a depression below, bending in and out until arriving at the river of San Patricio, containing 76 acres, etc."

This was the original inscription or record in the registry, but when the heirs of Eusebio Martínez acquired the property somewhat later there is a second inscription reproducing the preceding one, Rivera being substituted for Ayala, and adding: "the boundaries of the said property today are on the west, lands of Ramón Rivera, formerly José Ayala and Juan Salcedo; on the north the ridge of Yauco; on the east a dry brook separating the lands of Felix Jorge; on the south the River San Patricio."

It was this inscription which caused the principal confusion in the case. The latest records show that the lands of Joglar lie to the east of the property No. 174, while the earlier conveyance apparently shows Joglar on the west.

Juan Príncipe Vázquez acquired the land and sold it to the complainant and respondent. Juan Príncipe Vázquez rebought the land from José Ortiz. José Ortiz acquired it in 1907 by virtue of a suit and execution against Juan Príncipe

Vázquez. The same property, variously described as containing 76 or 84 acres, was acquired by Juan Príncipe in 1903 from the heirs of Eusebio Martínez. Eusebio Martínez acquired the land from his brother, Mauricio Martínez, in 1864, and before that time the land had formed a part of a tract of ·760 acres belonging to Mauricio Martínez and Benito de Arce.

Juan Príncipe Vázquez was the owner of another piece of land of 180 acres, as shown in the complaint. Part, or an interest in this land, was attached by The People of Porto Rico for default in the payment of taxes and bought in by The People of Porto Rico. The latter rented it to Juan Delgado, Juan Delgado and The People of Porto Rico being the defendants in this suit. The description of the parcel of 180 acres, which bears the number 4306, is as follows:

"A piece of land containing 180 acres, more or less, equivalent to 70 hectares, 74 ares and 72 centiares, situated in the ward of Tibes, place called 'San Patricio,' of this municipality, and this property is bounded as follows: Beginning at the mouth of a brook which empties into the river adjacent to land of Eusebio Martínez coincident with his line until arriving at the heights, where there is a *guásima* tree, from there following the ridge toward the west until the line comes to a *cucubano* tree which stands on the same ridge and touches upon Juan Príncipe Vázquez; from there in a southerly direction alongside Velázquez's property until it reaches an *emajagua* tree which is on the bank of the river and follows the boundary of Velázquez's land, and then continues downstream back to the place of beginning. The boundaries are: North, ridge between Utuado and Ponce; south, Patricio River; east, land of Eusebio Martínez; west, Successions of Juan and José Laureano Velázquez."

The agents of The People of Porto Rico, partly at the indication of Juan Delgado, partly on account of the misdescripton, and partly at the indication of other witnesses, decided that · the eastern boundary of this land was the property of the Succession of Joglar, in spite of the fact that the eastern boundary is declared to be the land of Eusebio

Martínez, and acting on this decision they placed the defendant, Juan Delgado, in possession of the lands actually described in the complaint. The proof is clear to the effect that Julián Polido Teissonier, Nepomuceno Delgado, Nicanor Vargas, Ayala, Rivera and Joglar have been the names of the people in successive possession of the land which bordered either on the east or the west the land of Eusebio Martínez, namely, property No. 174.

We think it is fairly evident from the original description of property No. 174 that the Succession Joglar, Ayala, or Rivera, as the case may be, lies to the east of said property No. 174. Beginning at the stone (*piedra agujerada*) the first side of the approximate quadrilateral described runs in a northerly direction with the land of José Ayala for a boundary. There is no dispute over the northern and southern boundaries. They are, respectively, the ridge of Yauco and the River San Patricio. When this first side of the quadrilateral described reaches the ridge of Yauco it stops. Then the next side is described as running to the west. If, then, the stone is placed at the southeast corner of the land of Ayala—the latter being likewise bounded by the ridge on the north—when the boundary line reaches such ridge, if the second side is to go to the west as the description demands, it would run into the land of Ayala itself and would not describe a piece of property independent of and bordering on Ayala. To bear away from the land of Ayala the stone would have to be placed on the southwest corner of Ayala's property. It seems fairly apparent that in attempting to fix the eastern and western boundaries by the names of the owners of the contiguous land the serivener confounded the east with the west.

As we have seen, Eusebio Martínez was the original owner of property No. 174 after it was segregated out of the piece of larger area. Not only does the description of property No. 4306—the 180 acres from which The People of Porto Rico claims title—place Eusebio Martínez to the east, but the de-

scription of the property of Ayala correspondingly places said Martínez to the west. This latter description is likewise in the record, showing Ayala to be possessed of a parcel of 150 acres.

The record also shows that properties Nos. 174 and 4306 were each subdivisions of a tract of land containing 760 acres belonging to Martínez and Arce. There is also a certificate in the registry showing that the land of Ayala—150 acres—was not a part of the 760-acre tract but was the most westerly portion of a 400-acre tract which lay to the east of the 760-acre tract. Hence, no matter where the properties Nos. 4306 and 174 are placed within the boundaries of the original 760-acre tract it would be impossible to locate the land of Ayala between them.

There is also evidence showing that when Ortiz attached property No. 174 he inscribed his property with the transposed eastern and western boundaries in the registry of property; that Juan Delgado was present and aided the marshal in locating the property. It is also a circumstance favorable to the respondent that the registrar made the inscription with the change of boundaries. The registrar had before him all the ancient deeds. Furthermore, the testimony of Juan Príncipe Vázquez, of Carlos Clausel, and of the former marshal, Juan Oswaldo Príncipe, who executed the attachment for Ortiz, all tended clearly to place property No. 174 to the west and not to the east of Joglar or Ayala. The marshal was a relative of Príncipe, it is true, but that did not destroy the probatory value of his testimony. There was a fairly large number of witnesses who placed the property to the east of Joglar and who said that Eusebio Martínez never held lands to the west thereof. Counsel for respondent points out the explanations and motives for this adverse testimony, but it is unnecessary for us to analyze the verbal evidence. If oral proof was at all necessary in the case, the conflict that existed was resolved by the trial judge, and we do not see in the rec-

ord any evidence of undue consideration or undue motives in his weighing of such proof.  For the reasons aforesaid the judgment should be affirmed.

*Affirmed.*

Chief Justice Hernández and Justices MacLeary, del Toro and Aldrey concurred.